UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MICHAEL F. POWERS,

                Plaintiff,

-vs-                               Case No.  5:04-cv-526-Oc-10GRJ

UNITED STATES DEPARTMENT OF
AGRICULTURE, ANN M. VENEMAN, in
her official capacity as Secretary of
Agriculture, KEVIN KELLEY, in his official
capacity as Florida State Executive
Director, RAY NAEYAERT, in his official
capacity as Chief of Florida FSA Loans,
LEON BRACHT, in his official capacity as
USDA Service Center, Lake County,

                Defendants.

_____

# O R D E R

On November 26, 2004, the Plaintiff, Michael F.  Powers, appearing *pro se*, initiated this action against the United States of America, the Department of Agriculture's Farm Service Agency, and various employees and officers of that agency, in connection with his failed attempt to purchase a crop of citrus fruit and a parcel of citrus grove property from the Farm Service Agency.   The case is before the Court for consideration of the Defendants' Motion for Summary Judgment (Doc.  12).   The Plaintiff has filed a response in opposition (Doc.   15), and the motion is now ripe for disposition.   Upon due consideration, the Court finds that the motion is due to be granted.

**Undisputed Facts and Procedural History**

**I.    Statutory Framework**

The Farm Service Agency (FSA) is a division of the United States Department of Agriculture.  The Consolidated Farm and Rural Development Act, 7 U.S.C. § 1921 et seq., provides the agency with, among other things, the authority to make direct and guaranteed farm ownership and operating loans at low interest rates and other favorable terms to family-size farmers and ranchers who cannot obtain commercial credit from a bank or other lender.  Such loans can be used to purchase land, livestock, equipment, feed, sand, and supplies, as well as to construct buildings or make farm improvements.  See 7 U.S.C. § 1923(a).  The FSA's customers are usually either beginning farmers[1] who have insufficient financial resources to qualify for conventional loans, or established farmers who have suffered financial setbacks from natural disasters, or whose resources are too limited to maintain profitable farming operations.

---

[1]A "beginning farmer" is defined as an individual or entity who (1) is an eligible applicant for Farm Ownership loan assistance; (2) has not operated a farm or ranch, or has not operated  a farm or ranch for more than 10 years; (3) will materially and substantially participate in the operation of the farm or ranch; (4) agrees to participate in any loan assessment, borrower training, and financial management programs required by the FSA; (5) does not own real farm or ranch property, or the aggregate acreage of real farm or ranch property owned by the individual or entity does not exceed 30 percent of the average farm or ranch acreage of the farms or ranches in the county where the property is located; (6) demonstrates the available resources of the applicant are not sufficient to enable the applicant to enter or continue farming or ranching on a viable scale; and (7) in the case of an entity, all members of the entity are related by blood or marriage and/or all stockholders in a corporation are qualified beginning farmers or ranchers.  See 7 C.F.R. § 1955.103.

When the FSA enters into a loan agreement, the agency is authorized to encumber the land or facilities which are bought with the loan proceeds as security for the loan, and may obtain a lien against that property as necessary. 7 U.S.C. § 1927(c).  If the borrower defaults on the loan, the FSA may acquire and dispose of the property on which it has a lien. 7 U.S.C. § 1985(a).  Real property the FSA acquires is known as "inventory property," and is considered "suitable" for sale if the property can be used for agricultural purposes. 7 C.F.R. § 1955.103.

The FSA is required by statute to publicly advertise suitable inventory property for sale within fifteen (15) days after acquisition, with a preference toward selling to beginning farmers or ranchers. 7 U.S.C. § 1985(c)(1)(A); 7 C.F.R. § 1955.107(a).  However, before the FSA can sell such property, it must provide the original borrower who defaulted on the loan the opportunity to apply for homestead protection, which provides the borrower with the ability to lease the property with the chance to later repurchase it. 7 C.F.R. § 1955.103. The original, foreclosed borrower, may apply for homestead protection either before or after the agency acquires the property; however, if the borrower waits until after acquisition, he must notify the FSA of his intent to seek such protection within 30 days of the date the FSA acquires the property. See 7 C.F.R. § 1955.107(a)(2); 7 C.F.R. § 1951.911(b)(2)(iii).  In addition, by Memorandum of Understanding, the United States Fish and Wildlife Service

has 45 days from notification by the FSA to comment on wetland determinations, particularly whether any wetlands easements exist (or should exist) on the land.[2]

In addition to the fifteen (15) day advertisement period, the FSA is required within seventy-five (75) days of acquiring suitable inventory property, to offer the property for sale specifically to qualified beginning farmers or ranchers at current market value[3] based on a current appraisal.  7 U.S.C. § 1985(c)(1)(B)(i).[4]  The FSA has the complete discretion to combine or divide real property into separate lots, in order to facilitate sales to beginning farmers.[5]

If an acceptable offer is not received from a qualified beginning farmer or rancher within thirty (30) days of offering the property for sale, the FSA may solicit sealed bids for the land.  If the FSA does not receive an acceptable offer through the sealed bids process, it may then offer the property to any interested party at a public sale.  7 U.S.C. § 1985(c)(1)(C).  If the FSA does not receive any acceptable bids at the public sale, the agency may sell the property by negotiated sale, at the best price obtainable.  Id.  Persons

---

[2]See Declaration of Michael Graham, ¶ 4, and exhibit E, (Attached as Exhibit A to the Defendants' Motion for Summary Judgment) ("Graham Decl."). See also 7 C.F.R. § 1955.137.

[3]Market value is defined as "[t]he most probable price which property should bring, as of a specific date, in a competitive and open market, assuming the buyer and seller are prudent and knowledgeable, and the price is not affected by undue stimulus such as forced sale or loan interest subsidy."  7 C.F.R. § 1955.103.

[4]In 2002, this time limit was expanded to 135 days.

[5]7 C.F.R. § 1955.140.

4

who participate in the negotiated sale process must provide a 10% cash down payment at the time their offer is accepted.  See 7 C.F.R. § 1955.107(b)(3).

When the FSA sells suitable inventory property, it conveys all of the interest of the United States in the property, including mineral rights.  7 U.S.C. § 1985(c)(3)(a).  However, the State Director of the FSA "is authorized to sell acquired chattels by auction, sealed bid, regular sale or, for perishable items and crops, by negotiated sale."  7 C.F.R. § 1955.121. The Secretary of Agriculture is further authorized to make rules and regulations governing the implementation of the FSA's loan program.  7 U.S.C. § 1989(a).

## II.   Factual Background

Against this framework, the FSA provided a low interest loan to Peggy Todd Smith to purchase eight parcels of land in Umatilla, Florida.  The parcels were used as citrus groves, and Ms.  Smith provided the land as security for the loan.  In 1998, Ms.  Smith allowed the FSA to voluntarily foreclose on the land, and provided the FSA with a warranty deed conveying the eight parcels to the agency on July 9, 1998.  The FSA provided Ms. Smith with a Notice of Availability of Homestead protection on July 15, 1998.  Ms.  Smith did not seek such protection, and at the end of the 30-day time period, the FSA solicited the U.S. Fish & Wildlife Service for its wetlands determinations on the property.[6]

On October 11, 1998, ninety-four (94) days after the FSA acquired the property, the agency advertised the eight parcels for sale to beginning farmers.  There is no explanation

---

[6]Graham Decl., exhibit d.

for the agency's failure to adhere to the statutory and regulatory advertising time limits, although it appears that the agency waited for the homestead protection and wetlands determinations time periods to elapse.  The FSA exercised its discretion and combined the eight parcels into three separate citrus groves consisting of 7.5, 21.34, and 132.5 acres each.  The newspaper advertisements advised that the sale "does not include 98/99 Fruit Crop on Trees."[7]  The citrus located on all three groves was sold separately by the FSA in October 1998.

On November 16, 1998, the Plaintiff, a qualified beginning farmer, applied to the FSA for a direct assistance loan under the beginning farmer program to acquire the 21.34 acre citrus grove.[8]  That same day, the FSA and the Plaintiff entered into a contract to sell the Plaintiff the grove.  The sales contract specifically stated that the sale "DOES NOT INCLUDE 98/99 CROP ON TREES."[9]  The sale closed in early January 1999 and the FSA

---

[7]The notation "98/99" stands for the year of the crop.  In other words, the FSA was selling the land without the citrus crop grown during the 1998-99 season.

[8]The Plaintiff contends that he did not enter into a contract with the FSA on November 16, 1998 to purchase the 21.34 acre grove, pointing to an internal FSA memorandum stating that his application had not yet been approved as of November 24, 1998.  See Opposition, Exhibit 6 (Doc. 15).  The Court does not see the materiality of this point, as the precise date the Plaintiff entered into the contract with the FSA is largely irrelevant to this case.  Nevertheless, the memorandum the Plaintiff relies upon does not prove his point.  This memorandum merely states that the Plaintiff has bid on the 21.34 acre grove, and that his application is pending.   It does not negate the possibility that the Plaintiff and the FSA had entered into a conditional contract, which would become final once his application was approved.  In fact, the FSA has submitted the "Standard Sales Contract" signed by both the Plaintiff and Defendant Leon Bracht, which is dated November 16, 1998, further negating the Plaintiff's claim.  See Graham Decl., exhibit I.

[9]See Graham Decl., exhibit I, p.1, ¶ 12.

deeded the 21.34 acre grove to the Plaintiff on January 4, 1999.  The deed specifically excluded the citrus crop, stating "[o]wnership of the 1998-99 fruit crop remains with the grantor."[10]

The FSA did not receive any applications from beginning farmers for the purchase of the other two citrus groves.  Accordingly, the FSA's Farm Loan Manager requested that the agency sell these groves by sealed bids.  The FSA advertised the two groves for sale by sealed bids starting on January 19, 1999.  The advertised sale of these two groves did not include their 1998-99 citrus crops.

The FSA appraised the value of the larger, 132.5 acre parcel at $616,500.  However, the highest sealed bid was $456,101.00, received from the Plaintiff and his business partner C.L. Hiatt.[11]  Because no bid came close to the appraised value, the FSA did not accept any of the offers.  The FSA notified the Plaintiff and all other bidders of this development by letter dated February 1, 1999.[12]  That letter advised all interested persons to submit their best and final offers by February 17, 1999.  The Plaintiff and his partner

---

[10] Id., exhibit m.

[11] The Plaintiff was not interested in the 7.5 acre parcel, and it is unknown whether this parcel ever sold.

[12] Graham Decl., exhibit n.  Pursuant to 7 C.F.R. § 1955.147, the FSA must determine and document the minimum sale price acceptable prior to placing property up for sale by sealed bid. The record in this case does not reflect any such minimum sale price.  However, at the pretrial conference held on September 20, 2006, counsel for the FSA explained that the FSA has an unwritten policy of using 80% of the appraised value as the minimum bid acceptable, and that this 80% amount - or $493,200 - was used during the January 1999 sealed bid process for the 132.5 acre grove.

7

submitted a late bid by letter dated February 23, 1999 of $405,930.[13]  Again, this bid and all others were rejected.

Because all other methods had failed, the FSA sought to sell the 132.5 acre grove by negotiated sale.  On April 8, 1999, the Plaintiff made an offer to lease and/or purchase the grove.[14]  By letter dated May 17, 1999, Defendant Ray Naeyaert, Chief Loan Officer for the FSA's state office in Florida, rejected this offer, stating that the FSA did not have the authority to lease the property.[15]  Naeyaert instead offered to sell the grove to the Plaintiff for $460,000 in cash.

On May 20, 1999 the Plaintiff accepted Naeyaert's proposal to purchase the 132.5 acre grove for $460,000, and requested information on what he needed to do to complete the sale.[16]  The sale fell through, however, when the Plaintiff was unable to obtain financing and provide the required 10% cash down payment.

The FSA retained possession of the grove, and on October 18, 1999, the Plaintiff presented another offer to purchase the 132.5 acre grove for $460,000.[17]  At this point, the Plaintiff had obtained at least part of the funds, and personally presented to Naeyaert a check for $46,000, representing ten percent of the purchase price.  However, by that time,

---

[13]Id., exhibit o.

[14]Id., exhibit q.

[15]Id., exhibit r.

[16]Id., exhibit s.

[17]Id., exhibit u.

the grove was bearing fruit worth approximately $100,000, which had grown during the 1999-2000 season, raising the appraised price of the grove to over $700,000.  Accordingly, the FSA could no longer accept such a low bid and rejected the Plaintiff's offer.

The Plaintiff called Naeyaert on his cell phone after leaving the FSA's offices and stated that he was willing to raise his bid for the grove up to $500,000.  The next day, October 19, 1999, Naeyaert contacted the Plaintiff via telephone and told him that the FSA would not sell the 132.5 acres for less than $550,000.  The Plaintiff rejected this counter-offer, and did not make any further offers or other attempts to purchase the grove.[18]

On February 21, 2001, another buyer sent the FSA an earnest money check, to initiate a purchase of the 132.5 acre grove for $485,000.[19]  The FSA accepted this offer and transferred title to that purchaser on June 20, 2001.

## II.   Procedural History

On October 8, 2002, the Plaintiff filed an administrative tort claim with the FSA, seeking $2,230,000 in damages in connection with his failed attempts to buy the 132.5 acre grove, and his failure to acquire the 1998-99 citrus crop on the 21.34 acre grove which he had purchased.  By letter dated July 11, 2003, the FSA notified the Plaintiff in writing that

---

[18] The Plaintiff states that he periodically contacted the FSA's state office to inquire about the status of the 132.5 acres.  He also asked Naeyaert to inform the Plaintiff of any ongoing negotiations to sell the grove.  According to the Plaintiff, he never heard from anyone at the FSA again until he contacted the FSA in July 2001 and learned that the grove had been sold.

[19] Graham Decl., exhibit v.  At the September 20, 2006 pretrial conference, counsel for the FSA explained that by February 2001, the appraised value had been lowered, thereby permitting sale at a price below $550,000.

his claim had been denied.  On December 17, 2003, the Plaintiff filed a request for reconsideration of the FSA's determination, which was denied on May 27, 2004.  The Plaintiff then filed this action on November 26, 2004.

In his original complaint (Doc. 1), the Plaintiff brought suit against the United States of America, the FSA, Ann M. Veneman, Secretary of Agriculture, Kevin L. Kelley, Florida State Executive Director for the FSA, Ray Naeyaert, Chief Loan Officer in Florida for the FSA, and Leon Bracht, Service Center Loan Officer for the FSA.  He has sued each individual defendant solely in his or her official capacity.  The original complaint contained a claim for monetary damages under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) ("FTCA") alleging the Defendants breached their fiduciary duty to the Plaintiff when they did not advertise the citrus groves for sale within the statutory 75-day period, and when they did not include the 1998-99 citrus crop in the sale of the 21.34 acre grove.  The original complaint also contained a claim for injunctive relief, requesting that the Court set aside the June 20, 2001 sale of the 132.5 acre grove, restore the Plaintiff's "preferential right" as a beginning farmer to purchase that grove, and require the FSA to use the $616,500 appraisal price set in 1999 during the resale process.

Before any Defendants responded to the Plaintiffs' claims, he amended his complaint (Doc. 3).  The amended complaint retained the breach of fiduciary duty claim and claim for injunctive relief, and added a claim for declaratory relief.  In particular, the Plaintiff requests an order from the Court declaring that the FSA was obligated by controlling law to offer and sell the citrus groves to the Plaintiff within the time frames set forth in 7 U.S.C. § 1985.

Upon the completion of discovery, the Defendants filed a joint motion for summary judgment (Doc. 12), to which the Plaintiff has responded (Doc. 15).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. Celetex, 477 U.S. at 324.

## DISCUSSION

**I.    The Complaint Asserts a Basis for Jurisdiction**

11

"It is well settled that sovereign immunity bars suits against the United States except to the extent that it consents to be sued." <u>Means v United States</u>, 176 F.3d 1376, 1378 (11th Cir. 1999).  Any waiver of sovereign immunity must be unequivocal in the language of a federal statute and cannot be implied; such waivers are strictly construed.  <u>United States v. Mitchell</u>, 445 U.S. 535, 538 (1980).

Applying this established principle to this case, the Defendants first seek summary judgment in their favor on the grounds that the Plaintiff has not sufficiently alleged a basis for subject matter jurisdiction over his claims.  The Defendants contend that neither the Declaratory Judgment Act, 28 U.S.C. § 2201, nor 7 U.S.C. § 1985 provide an independent basis for jurisdiction.  Although the Defendants are correct,[20] they ignore the Plaintiff's reference in his amended complaint to the Federal Tort Claims Act, which clearly does provide this Court with jurisdiction over any tort claims seeking monetary damages.[21]  To be sure, the Plaintiff's reference to the FTCA is not the most artful, however it is sufficient, particularly in light of the leniency afforded *pro se* litigants when construing their pleadings,

---

[20]<u>See</u> <u>Household Bank v. JFS Group</u>, 320 F.3d 1249, 1253 (11th Cir. 2003) (requiring independent basis for federal jurisdiction other than Declaratory Judgment Act); <u>Fields v. United States</u>, No. 3:93CV95-B-D, 1994 WL 1890895 n. 4 (N.D. Miss. Dec. 23, 1994) (there is no private right of action under 7 U.S.C. § 1985).

[21]<u>See</u> 28 U.S.C. §§  1346(b)(1), 2679(b)(1) (both establishing that district courts have exclusive jurisdiction of tort civil actions for money damages).  <u>See also</u> Amended Complaint, ¶ 6 ("The defendants' breaches of duty and violation of law preclude discretionary exception to the immunities otherwise available to defendants under the Federal Tort Claims Act.").  The Plaintiff reasserts in his opposition to summary judgment that he has brought his claims pursuant to the Federal Tort Claims Act, 28 U.S.C. § § 1346(b) and 2670 <u>et seq</u>.  <u>See</u> Opposition, p. 4 (Doc. 15).

to place the Defendants on notice of the basis of jurisdiction with respect to the Plaintiff's claims for monetary damages (the breach of fiduciary duty claim).[22]

However, because the Plaintiff is pursuing monetary relief under the FTCA, all of his claims against the individual Defendants and the FSA pursuant to that Act must be dismissed.  The Plaintiff admittedly has sued each individual Defendant in his or her official capacity as an officer or employee of the FSA.  It is beyond dispute that claims brought under the FTCA against any officer or employee in their official capacity are deemed to be claims against the United States itself.  See 28 U.S.C. § 2679(d); Dugan v. Rank, 372 U.S. 609, 619-22 (1963); Daniel v. United States, 891 F.Supp. 600, 603 (N.D. Ga. 1995).  In addition, claims under the FTCA that are brought against an agency of the United States are considered claims solely against the United States.  See Galvin v. Occupational Safety & Health Admin., 860 F.2d 181, 183 (5th Cir. 1988); Daniel, 891 F.Supp. 603.  Thus, to the extent the Plaintiff seeks relief under the Federal Tort Claims Act, such claims may only proceed against the United States.  The Plaintiff apparently concedes this point in his opposition as well.[23]   The FSA and the individual Defendants are therefore entitled to summary judgment on the Plaintiff's FTCA claims.

_____

[22]See GJR Investments, Inc. v. County of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998) (courts should show "a leniency to pro se litigants not enjoyed by those with the benefit of a legal education.").

[23]See Opposition, p. 15.

13

However, the Plaintiff's claims for injunctive and declaratory relief may go forward against all of the Defendants.  The Court has jurisdiction over these claims under the judicial review provisions of the Administrative Procedures Act, 5 U.S.C. § 702 et seq. ("APA").[24]  Although the Plaintiff does not specifically mention the APA in his amended complaint, he does appear to seek relief under it. For example, he contends that the FSA's failure to adhere to the timing requirements set forth in 7 U.S.C. § 1985 "constitutes arbitrary and capricious conduct,"[25] and that he was injured by the agency's  actions.[26] Thus, liberally construing the pro se Plaintiff's amended complaint, the Court concludes that the Plaintiff has adequately alleged a basis for jurisdiction under the APA for his equitable claims.  See also Wilderness Society v. Alcock, 83 F.3d 386, 389 n. 5 (11th Cir. 1996) (noting that unless the statute being challenged provides for judicial review of agency action, judicial review is obtained pursuant to the APA).

## II.    The Plaintiff's FTCA Claim is Time Barred

Although the Court has determined that the Plaintiff has alleged a sufficient basis for jurisdiction under the FTCA for his breach of fiduciary duty claim, the Court has serious

---

[24]In his Opposition, the Plaintiff contends that he should be allowed to pursue monetary relief under the Administrative Procedures Act.  See Opposition, p. 17.  His contention runs contrary to the plain language of the APA.  See 5 U.S.C. § 702; Lawyers Title Ins. Corp. v. Phillips, 108 F. Supp. 2d 1382, 1386 (M.D. Ga. 2000).  Accordingly, to the extent the Plaintiff seeks monetary damages pursuant to the APA, those claims cannot go forward.

[25]See Amended Complaint, ¶¶ 8-9

[26]Id., ¶ 50.  See also 5 U.S.C. § 702 (persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" may obtain judicial review of the action).

doubts as to whether the Plaintiff's claim can succeed, based on the record presented. However, the Court need not address the substance of this claim, because it is time barred.

The FTCA provides only a limited waiver of the United States' sovereign immunity for tort claims. Suarez v. United States, 22 F.3d 1064, 1065 (11th Cir. 1994). Failure to exhaust administrative remedies and file a claim within the specified time periods will divest this Court of jurisdiction to consider the claim. Id. (citing 28 U.S.C. § 2675(a)). Specifically, section 2401 of the FTCA provides that a tort claim against the United States

> shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). See also Phillips v. United States, 260 F.3d 1316, 1317 (11th Cir. 2001).

There is no dispute that the Plaintiff presented a claim to the FSA in writing, and that the FSA reviewed and ultimately denied that claim. There is also no dispute that the Plaintiff commenced this action within six months of the date he received final notice from the FSA that his claim had been denied. However, the United States contends that the Plaintiff did not file his administrative claim with the FSA until the two year period had elapsed. According to the United States, the date upon which the two year period began to run is October 18, 1999, the date the FSA rejected the Plaintiff's final offer to purchase the 132.5 acre parcel. The Plaintiff did not file his claim with the FSA until October 11, 2002, nearly three years later. Thus, if the United States is correct, then the Plaintiff's

15

claim to the FSA was filed almost one year outside the applicable time period and is therefore barred.

The Plaintiff contends that the two year time period did not begin to accrue until June 20, 2001, the date he discovered that the FSA had sold the 132.5 acre grove to another purchaser.[27]   This is the same date that the FSA transferred title to that purchaser. According to the Plaintiff, "[t]he ongoing deprivation of rights and unlawful acts where unknown to the Plaintiff due to his fiduciary reliance on his loan officer and the other FSA officials."[28]   The Plaintiff is wrong.

A claim under the FTCA accrues when the plaintiff has knowledge of an injury and its cause, not when the plaintiff realizes that he has a cause of action.  United States v. Kubrick, 444 U.S. 111, 123 (1979).  There can be no dispute that the Plaintiff had direct, first-hand knowledge of his injury (his inability to purchase the 132.5 acres) and the cause of his injury (the FSA's rejection of his final bid) on October 18, 1999 when Naeyaert personally told the Plaintiff that the FSA would not accept his offer.  It could even be argued that the injury and cause accrued on October 19, 1999, when Naeyaert contacted the Plaintiff with the FSA's $550,000 counter-offer, which the Plaintiff immediately rejected. Regardless of which date is used, it is clear that the Plaintiff did not file his administrative

---

[27]This statement conflicts with the Plaintiff's prior statement that he learned of the sale in July 2001.  See Opposition, p. 8.  The date on which the Plaintiff learned of the sale is irrelevant, however, as the two-year time period began to run on the date the FSA rejected the Plaintiff's final offer in October 1999.

[28]See Pretrial Statement (Doc. 18), p. 3.

claim with the FSA until well after the two year period had elapsed.[29]  Accordingly, his

FTCA claim for breach of fiduciary duty against the United States cannot proceed, and the

United States is entitled to summary judgment on this claim.[30]

## III.   The FSA's Actions Were Not Arbitrary and Capricious

The Court next turns to the Plaintiff's claims for declaratory and injunctive relief under

the APA.  The APA generally allows persons "suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action within the meaning of a

relevant statute" to obtain judicial review of the agency's actions.  5 U.S.C. § 702.

Pursuant to 5 U.S.C. § 706(2), in reviewing an agency's action, the Court must hold

unlawful and set aside agency actions, findings, and conclusions that are found to be: (1)

arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2)

unconstitutional; (3) in excess of statutory authority; (4) without observance of procedure

---

[29]To the extent that the Plaintiff is also seeking relief under the FTCA based on the FSA's refusal to sell him the 1998-99 citrus crop on the 21.34 acre lot, that claim is also obviously time barred.  Any claim based on this event accrued at the latest on January 4, 1999, the date the Plaintiff obtained title to the grove without the citrus crop, and the Plaintiff did not file his administrative claim with the FSA within two years of that date.

[30]The Plaintiff appears to argue that the June 20, 2001 date should apply because he made repeated attempts to obtain the 132.5 acre grove even after his final offer was rejected.  The undisputed facts in this case belie this theory.  The Plaintiff himself states that the only actions he took after October 1999 were to "periodically contact[ ] the state office in reference to their current position in reference to the sale.  Plaintiff even went as far as requesting Mr. Neyaert to keep him abreast of any ongoing negotiations."  See Opposition, p. 8.  Plaintiff never made any additional bids for the land, and never took any other actions to attempt to purchase the land, and the FSA had no obligation to keep the Plaintiff informed of the status of the grove.  Thus, the only injury to the Plaintiff occurred in October 1999 when the FSA rejected his final offer for the grove.  Simply making occasional phone calls to the FSA cannot extend the FTCA's statutory two-year time period.

as required by law; (5) unsupported by substantial evidence; or (6) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court.   In the present case, the Plaintiff contends that the FSA's actions in delaying its advertisements for sale of the groves, the manner in which the agency negotiated its sale of the 132.5 acre grove, and various allegedly false representations made to the Plaintiff during the course of his sales negotiations, constitute arbitrary and capricious conduct subject to review.[31]

The "arbitrary, capricious, or abuse of discretion" standard is highly deferential to the agency's actions and decisions.   See North Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1538-39 (11th Cir. 1990) ("Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal.").  The Court must determine, based on the record before it, "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 285 (1974).   The scope of review is quite narrow, and the Court cannot substitute its own judgment for that of the agency. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  However, "the court must also look beyond the

---

[31]See Amended Complaint, ¶¶ 8-9.  The Plaintiff does not allege in his Amended Complaint that the FSA's actions were unconstitutional, in excess of statutory authority, not supported by substantial evidence, or unwarranted by the facts to the extent that a trial *de novo* is required, although he does make reference to these other sections, for the first time, in the Joint Pretrial Statement.  See Doc. 18, p. 3.  Even if the Plaintiff is permitted to proceed at this late stage under these other provisions of the APA, his claims would fail.  The Plaintiff simply alleges that the FSA and its officers did not properly follow their own timing regulations and gave the Plaintiff incorrect information.  Such acts are not unconstitutional, do not fall outside of the FSA's statutory authority, and do not implicate the provisions of the APA dealing with substantial evidence or trial *de novo.*

scope of the decision itself to the relevant factors that the agency considered." Sierra Club v. United States Army Corps. of Eng'rs, 295 F.3d 1209, 1216 (11th Cir. 2002) (citations omitted).  Applying this deferential standard of review to the Plaintiff's claims, it is clear that the FSA's actions with respect to the sale of the groves were not arbitrary, capricious or an abuse of discretion.

A.      The Sale of the 21.34 Acre Grove

The Plaintiff first argues that the FSA's failure to adhere to its deadlines for advertising and selling the groves resulted in the Plaintiff losing the ability to purchase the 1998-99 citrus crop located on the 21.34 acre grove.  There is no dispute that the FSA did not advertise the groves for sale within 15 days of acquisition, and did not offer the groves for sale until after the 75-day time period had elapsed.  The question then becomes whether the FSA's 19-day delay in offering the groves for sale was "arbitrary, capricious or an abuse of discretion."  The Court finds that it is not.

First, the Court finds that the FSA's failure to strictly adhere to its deadlines was not prejudicial error.  See 5 U.S.C. § 706 (when reviewing agency actions "due account shall be taken of the rule of prejudicial error."); Mississippi Commission on Natural Resources v. U.S. Environmental Protection Agency, 625 F.2d 1269, 1278 (5th Cir. 1980) ("The APA requires a consideration of whether prejudice has resulted.").  The doctrine of prejudicial error is used "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached." U.S. Steel Corp. v. U.S. Environmental Protection Agency, 595 F.2d 207, 215 (5th Cir. 1979).  "Even where an

19

agency fails to comply strictly with its requirements, the administrative determinations made will not be set aside in the absence of prejudice to the plaintiff." Lewis v. Glickman, 104 F. Supp.2d 1311, 1324 (D. Kan. 2000). See also Sun Oil Co. v. Federal Power Commission, 256 F.2d 233 (5th Cir. 1958) ("In a particular case an administrative agency may relax or modify its procedural rules and its action in so doing will not be subjected to judicial interference in the absence of a showing of injury or substantial prejudice."). The burden of demonstrating prejudice rests with the plaintiff, and  "[p]rocedural irregularities are not per se prejudicial." Lewis, 104 F. Supp.2d at 1324.

In this case, the Plaintiff has failed to establish that he suffered any prejudice with respect to his purchase of the 21.34 acre grove.  The Plaintiff apparently contends that if the FSA had offered the grove for sale within the required 75-day time period, he would have been able to bid and purchase the grove before the 1998-99 citrus crop had been harvested, and therefore would have been able to purchase the citrus crop as well as the acreage for the same price.  This makes no sense.  The Plaintiff purchased exactly what he agreed to - the 21.34 acre grove at the current fair market value absent the fruit.  There is no dispute that the fair market value of the grove was established for the land only, it did not include the 1998-99 citrus crop.[32]  Thus, there can be no argument that the Plaintiff paid for something that he did not receive; the FSA was completely transparent about what it

---

[32]At the September 20, 2006 pretrial conference, the Plaintiff argued that the appraised fair market value did include the value of the citrus crop.  However, the Plaintiff has not presented any evidence or legal authority to establish this fact.

was selling.  The advertisements and all sales documents clearly stated that the 21.34 acres were being sold without the 1998-99 citrus crop.  The Plaintiff willingly entered into this sales transaction, fully aware that he was not purchasing the citrus crop.  The Court therefore does not see how the Plaintiff could have been harmed in any manner by the FSA's brief delay.  See, e.g., Mississippi Commission on Natural Resources, 625 F.2d at 1278 (affirming government agency action even though the agency failed to meet its statutory deadlines because no prejudice was shown on the record).

Even if the Plaintiff were somehow able to establish prejudice, the Court finds that the FSA's brief delay in advertising and offering the 132.5 acres for sale to beginning farmers was not arbitrary, capricious, or an abuse of discretion.  Rather, it appears that the FSA was reasonable in waiting until the 30-day homestead protection period and 45 day period for obtaining wetlands determinations had both elapsed.[33]  Otherwise, the agency could have been placed in the precarious position of offering the groves for sale, accepting bids, and then having to terminate or modify the sale due to either Ms.  Smith claiming homestead protection, or the U.S. Fish & Wildlife Service deciding that the land contained wetlands easements.  The FSA regulations even address this dilemma.  See 7 C.F.R. §

---

[33]The Plaintiff contends that the FSA should not have waited for these time periods to elapse because the FSA was required to inform borrowers of their right to homestead protection before the agency acquired the land, and because the FSA obtains wetlands determinations before entering into any loans with beginning farmers.  Thus, according to the Plaintiff, the FSA already had on file any documents concerning the homestead and wetlands status of the groves. What the Plaintiff ignores, however, is the fact that Ms.  Smith had 30 days from acquisition to notify the FSA whether she intended to seek homestead protection.  The Plaintiff further ignores the fact that wetlands determinations are not static and the FSA was required to seek updated determinations.

1955.107(a)(2) ("<u>After homestead protection rights have expired</u>, suitable farmland must be sold in the priority outlined in this paragraph.") (emphasis added).  Thus, it does not appear that the FSA in fact violated any of its timing regulations, but even if it did, it acted reasonably, and complied with all other statutory and regulatory requirements concerning the timing and methods of selling the groves.  In addition, the Consolidated Farm and Rural Development Act does not impose any sanctions or other consequence for missing any of the advertising or sales deadlines, and it is not clear that the Plaintiff even has any legal recourse to obtain relief on this claim.[34]  Accordingly, the Court does not believe that the brief delay in placing these groves up for sale runs afoul of the APA.

This claim fails for yet another reason.  The Plaintiff argues that if the FSA had placed the groves up for sale within the required 75-day time frame, the agency would have sold the land and the citrus crop to the Plaintiff (presumably at the same price).  Not only is such a claim too speculative to warrant serious consideration, it is contrary to the express language of FSA regulations.  The FSA was expressly authorized to sell the citrus crop separately, by auction, sealed bid, regular sale, or negotiated sale, and to use its discretion to determine the manner of sale.[35]  There is no timing restriction on this authority

---

[34]Even if the Plaintiff could somehow establish prejudice, it appears that his claim under the APA would fail for another, more basic reason.  The only possible remedy would be to award the Plaintiff some amount of monetary damages, possibly to compensate him for the price at which he would have sold the citrus crop.  Not only are such damages speculative and difficult to calculate, they constitute monetary damages, which are not available under the APA.

[35]<u>See</u> 7 C.F.R. § 1955.121 ("The State Director is authorized to sell acquired chattels by auction, sealed bid, regular sale or, for perishable items and crops, by negotiated sale.").  The
(continued...)

- the regulation does not require the FSA to wait until the 75-day "beginning farmer" sale period is over before the agency can separate the crop and sell it to another buyer.  In other words, there is no guarantee, and the Plaintiff has made no showing, that the FSA would have acted any differently  - *i.e.* it would not have sold the citrus crop separately to another buyer - if it had adhered to the 75-day time period and advertised the groves for sale 19 days earlier.  Instead, the FSA did exactly what it was authorized to do.  It sold the crop by negotiated sale, and it sold the land to a beginning farmer at current fair market value.

## II.   The 132.5 Acre Grove

The Plaintiff also claims that the FSA's failure to adhere to the 75-day time period prevented him from purchasing the 132.5 acre grove.  This portion of the Plaintiff's claim also fails because he has not demonstrated any prejudice. The record shows that the FSA's delays did not prevent the Plaintiff from placing the highest bid on the grove during the initial sealed bid process.  In fact, the Plaintiff himself admits that the delays were to his benefit - they allowed him additional time to inspect the land, re-evaluate his decision to purchase the land, and develop a new bid.[36]  The record also shows that the FSA's delays did not prevent the Plaintiff from entering into negotiations with the agency to first lease the

---

[35](...continued)
Plaintiff reads this provision to mean that the FSA can only sell perishable crops by negotiated sale.  This is not a correct reading of the regulation.  Rather, it provides for the negotiated sale of perishable items **and** crops, two completely separate categories of property.  The word perishable does not define or otherwise limit the word crops.

[36]See Graham Decl., exhibit n.

land, and when it was determined that leasing was not feasible, to accept the FSA's offer to purchase the 132.5 acre grove for $460,000.  The only reason this sale fell through was because the Plaintiff could not obtain financing or the required 10% down payment.  By the time the Plaintiff reopened negotiations with the FSA, the market value of the land had increased to such a point that the FSA could no longer accept such a low offer.  Again, the Plaintiff could not obtain financing for the new $550,000 purchase price.  These failures on the part of the Plaintiff had nothing to do with the FSA at all.[37]   Thus, the delay in advertising and offering the 132.5 acres to beginning farmers was not prejudicial error.  See Cerniglia v.  Glickman, 118 F.  Supp.2d 27, 35 (D.D.C 2000) (15-month delay in

---

[37]The Plaintiff contends that his inability to obtain financing and failure to place a bid during the initial beginning farmer sales period was due to the FSA's failure to advise him that the maximum loan the Plaintiff could obtain from the FSA was a $700,000 guaranteed loan through a commercial lender.  According to the Plaintiff, the FSA incorrectly told him that the maximum he could borrow was a $200,000 direct loan from the FSA and a $300,00 guaranteed loan from a commercial lender.  If the Plaintiff had received the correct information, he claims he would have offered to purchase the 132.5 acre grove sooner, and would have had adequate financing.  Again, this makes no sense.  It is undisputed that the reason the sale did not go through was the Plaintiff's inability to produce the 10% down payment.  If the Plaintiff could not obtain a 10% down payment on his original offer of $460,000 until October 1999, the Court does not see how the Plaintiff would have made a 10% down payment on a larger loan of up to $700,000 any sooner.  In addition, the total amount of loans the FSA informed the Plaintiff he was eligible for would have covered even his highest negotiated purchase price of $550,000 (10% down of $55,000 plus $495,000 in loans).  The only support for the Plaintiff's argument concerning available loan amounts is a photocopy of a page that appears to be from an information packet from the FSA describing the maximum loan amounts for various transactions.  There is no date or other identifying information on this page that would indicate when the higher maximum loan amounts were in effect.  The Plaintiff has also made no attempt to authenticate this document - in other words, the Court has no idea where this page came from or what it represents.  As such, it is not admissible, nor persuasive on this point.

completing loan application was not arbitrary and capricious where the delay could not have caused the alleged injury).

The Plaintiff also challenges the negotiation tactics used by the FSA, particularly the agency's refusal to accept his offers in October 1999.  According to the Plaintiff, the FSA did not have the authority to reject his bid of $460,000, raise the purchase price to $550,000, or reject his new bid of $500,000.  The Plaintiff also challenges the FSA's failure to keep him fully informed of all future negotiations on the property.  The Plaintiff is mistaken, as the applicable regulations clearly state that "[i]f no acceptable bid is received from a sealed bid or auction, the State Executive Director <u>will sell real property at the maximum price obtainable without further public notice by negotiating with interested parties</u>, including all previous bidders."  7 C.F.R. § 1955.107(b)(3) (emphasis added).

The FSA followed this regulation to the letter.  It did not receive any acceptable bids from either its sealed bid or public auction procedures, (and the FSA has the sole discretion to determine whether a bid is acceptable or not),[38] and accordingly entered into negotiations with all interested parties.  For the first two years, the FSA dealt solely with the Plaintiff, giving him every opportunity to purchase the grove.[39]  However, when the Plaintiff could not secure financing or the 10% cash down payment, the FSA eventually exercised

---

[38]<u>See</u> 7 C.F.R. §1955.104(c) ("[t]he servicing official has the authority to offer for sale, accept and/or reject bids or offers for inventory property regardless of amount.").

[39]Indeed, the FSA could have ceased negotiations with the Plaintiff when it became apparent that he would not be able to purchase the land, and consider transferring the property to other federal, state or local governmental entities.  <u>See</u> 7 C.F.R. § 1955.144(a).

its discretion to negotiate with another party who could purchase the property.  The agency was under no obligation to keep the Plaintiff informed of its negotiations,[40] and it had the complete discretion to set the sales price at the maximum price obtainable.[41]

The fact that the FSA eventually sold the 132.5 acres for less than the Plaintiff's maximum bid in October 1999 is of no effect.  Rather it simply shows either a change in market value, or a realization after retaining the land for almost three years, that the maximum price obtainable was only $485,000.[42]  The agency acted within its discretion to sell the 132.5 acre grove, as permitted by law.[43]  Such actions are not subject to review

---

[40]See 7 C.F.R. § 1955.107(b)(3)(ii) ("[t]he amount offered by one interested party will not be disclosed to any other party except when negotiation is by preliminary open negotiation.").  The preliminary open negotiation period had long elapsed by the time the FSA sold the property in June 2001.

[41]The Plaintiff refers to 7 C.F.R. § 1955.147, which requires that the State Executive Director determine and document the minimum sale price acceptable prior to placing property up for sale by sealed bid, as support for his claim that the FSA was required to tell him and all other interested parties what the minimum acceptable price was before attempting to sell the 132.5 acres.  First, this provision applies only to sealed bids, not negotiated sales.  Second, this provision does not require publication of the minimum acceptable price, only that the FSA set such a price internally prior to initiating the sealed bid process.  There is no evidence in the record demonstrating that the FSA did not follow this requirement during the sealed bid process.

[42]If the Plaintiff had renewed his offer of $500,000 in 2000 or 2001, perhaps he might now be the owner of the land.  However, after the last round of negotiations in October 1999, the Plaintiff took no further steps to obtain the grove other than to periodically call the FSA.

[43]The fact that the FSA chose to offer the 132.5 acre grove for sale in October 1999 with the citrus crop intact was also not arbitrary or capricious.  The agency had the discretion to sell the crop separately, or to include it with the land itself.  See 7 C.F.R. § 1955.124 ("[i]nventory chattel property may be sold with inventory real estate if a higher aggregate price can be obtained.").

under the APA.  See 5 U.S.C. § 701(a)(2) (the APA does not apply when "agency action is committed to agency discretion by law.").

Finally, the Plaintiff points to several alleged misrepresentations by the FSA which he contends operated to thwart his efforts to purchase the 132.5 acres.  For example, the Plaintiff argues that he was incorrectly told by Naeyaert that the FSA had no authority to further subdivide the groves for sale.  Such a statement would be wrong.  The FSA had the complete authority and discretion to combine or subdivide inventory property into suitable farm tracts.[44]  In fact, this is exactly what the FSA did; but the power to divide a tract of property for sale does not translate into a duty to do so at the request of any aspiring purchaser.  The agency did not act arbitrarily or capriciously by refusing to further subdivide the parcels, and if it misinformed the Plaintiff, it was harmless error.

The Plaintiff also claims that he was misled by the FSA when it told him that the agency did not have the authority to first lease the property to him, and that he would have been able to lease and/or purchase the land if the FSA had been truthful.  Again, such a claim is entirely too speculative to have any merit, particularly in light of the obvious and undisputed difficulties the Plaintiff was having in obtaining financing for the 132.5 acres. Moreover, it was within the discretion of the FSA to lease inventory property, and in this case the agency determined that it did not have the authority to do so.[45]  The Plaintiff has

---

[44]See 7 C.F.R. § 1955.140(a).

[45]Normally, suitable property is available for lease for up to 18 months to beginning farmers
(continued...)

not presented any evidence to challenge this fact, other than a vague claim that the statutes encourage leasing.

In sum, the Plaintiff has failed to demonstrate either that the FSA acted in an arbitrary or capricious manner when it sold the 21.34 and 132.5 acre groves, or that the Plaintiff suffered any prejudice from the FSA's actions.  As such, the FSA's decisions and actions with respect to the sale of these two groves shall be affirmed and the Plaintiff's claims under the APA must be denied.[46]

## Conclusion

Accordingly, upon due consideration, it is ORDERED and ADJUDGED that the Defendants' Motion for Summary Judgment (Doc. 12) is GRANTED.  The Clerk is directed to enter judgment in favor of the Defendants and against the Plaintiff on all claims, terminate any pending motions, and close the file.

IT IS SO ORDERED.

---

[45](...continued)
if FSA credit assistance is not available at the time of sale.  7 C.F.R. § 1955.107(a).  In this case, credit assistance was available to beginning farmers.  The Plaintiff, however, was simply not able to come up with the 10% down payment.  Therefore, the FSA was not authorized to lease the property, and did not provide false information to the Plaintiff.

[46]Because the Court has determined that the FSA did not act arbitrarily or capriciously with respect to its sale of the 21.34 and 132.5 acre groves, the Plaintiff's references to Simmons v. Block, 782 F.2d 1545 (11th Cir. 1986) or Velarde v. United States, 992 F. Supp. 1235 (D. Colo. 1998) are of no effect.

DONE and ORDERED at Ocala, Florida this 25th day of September, 2006.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Michael F.  Powers, *pro se*